UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MAXWELL H.,

                Plaintiff,

   -against-                                        1:19-CV-0148 (LEK/CFH)

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

## MEMORANDUM-DECISION AND ORDER

**I. INTRODUCTION**

On February 6, 2019, plaintiff Maxwell H. filed an action in this Court under the Social Security Act. Dkt. No. 1 ("Complaint"). He seeks review of a determination by the Commissioner of Social Security that he was not disabled from January 1, 2011 through March 12, 2018—the date an Administrative Law Judge ("ALJ") denied his disability applications—and is therefore ineligible for disability insurance benefits and supplemental security income. Id.; see also Dkt. Nos. 6 ("Record"), 7 ("Plaintiff's Brief"), 11 ("Defendant's Brief"). For the reasons that follow, the Court vacates the Commissioner's determination of no disability.

**II. LEGAL STANDARDS**

    **A. Standard of Review**

"When a district court reviews an ALJ's decision, it must determine whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence in the record." Harry P. v. Saul, No. 17-CV-1012, 2019 WL 4689213, at *6 (N.D.N.Y. Sept. 26, 2019) (Kahn, J.) (citing 42 U.S.C. § 405(g)). "Substantial evidence amounts to 'more than a mere scintilla,' and it must reasonably support the decision maker's conclusion. Courtney F. v.

Berryhill, No. 18-CV-47, 2019 WL 4415620, at *1 (N.D.N.Y. Sept. 16, 2019) (Kahn, J.) (quoting Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004)). "A court will defer to the ALJ's decision if it is supported by substantial evidence, even if [the court] might justifiably have reached a different result upon a de novo review." Suzanne M. v. Comm'r of Soc. Sec., No. 18-CV-485, 2019 WL 4689227, at *1 (N.D.N.Y. Sept. 26, 2019) (Kahn, J.) (internal quotation marks omitted) (alteration in original). "However, a court should not uphold the ALJ's decision—even when there is substantial evidence to support it—if it is based on legal error." Craig R. v. Berryhill, No. 18-CV-630, 2019 WL 4415531, at *1 (N.D.N.Y. Sept. 16, 2019) (Kahn, J.) (citing Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998)).

**B. Standard for Benefits**

According to Social Security Administration regulations, a disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An ALJ follows a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Social Security Act:

> At step one, the ALJ determines whether the claimant is engaged in substantial gainful work activity. See 20 C.F.R. §§ 404.1520(b), 416.920(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, in that it imposes significant restrictions on the claimant's ability to perform basic work activities. Id. §§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the analysis concludes with a finding of "not disabled." If the claimant does have at least one severe impairment, the ALJ continues to step three.
>
> At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). Id. §§ 404.1520(d), 416.920(d). If the impairment meets or medically equals the criteria of a

> Listing and meets the durational requirement (id. §§ 404.1509, 416.909), the claimant is disabled. If not, the ALJ determines the claimant's residual functional capacity ("RFC"), which is the ability to perform physical or mental work activities on a sustained basis, notwithstanding limitations for the collective impairments. See id. §§ 404.1520(e), 416.920(e).
>
> The ALJ then proceeds to step four and determines whether the claimant's RFC permits the claimant to perform the requirements of his or her past relevant work. Id. §§ 404.1520(f), 416.920(f). If the claimant can perform such requirements, then he or she is not disabled. If he or she cannot, the analysis proceeds to the fifth and final step, where[] the burden shifts to the Commissioner to show that the claimant is not disabled. Id. §§ 404.1520(g), 416.920(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of the claimant's age, education, and work experience. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quotation omitted); see also 20 C.F.R § 404.1560(c).

Kester v. Comm'r of Soc. Sec., No. 18-CV-989, 2020 WL 702656, at *2 (W.D.N.Y. Feb. 12, 2020).

## III. RELEVANT BACKGROUND

Plaintiff is a 29-year-old man who suffers from asthma and various mental health ailments. R. at 19–24, 209. He previously completed one year of college and worked as a construction worker, a fast food worker, and an assembler for a lighting company. R. at 225–26.

Plaintiff seeks a finding that he was disabled from January 1, 2011 through March 12, 2018 due to various mental health conditions. R. at 16, 47. His challenge to the Commissioner's disability determination turns on whether his condition worsened during the two years between his consultative exam and his hearing in front of the ALJ, thus the Court summarizes separately the relevant background from the pre- and post-exam periods.

### A. Pre-Consultative Exam Evidence (May 2011 through September 2015)

The earliest evidence in the record dates from May 2011, when Plaintiff visited the emergency department of St. Joseph's Hospital seeking treatment for "worsening anxiety,

3

periods of crying spells, [] depressed mood[,] . . . low energy[,] and poor concentration." R. at 339; see also R. at 343. At that visit, he denied suicidal ideation and audiovisual hallucinations. R. at 339. Doctors at that visit diagnosed Plaintiff with "anxiety state" and assigned him a Global Assessment of Functioning ("GAF") score of 48.[1] R. at 344–45. Plaintiff suffered similar episodes and received similar diagnoses several times over the next few years.

Greatly summarizing a voluminous record, between his 2011 visit to St. Joseph's Hospital and the beginning of October 2015, Plaintiff visited the emergency room seven more times, twice in January 2014, R. at 299–333, once in February 2014, R. at 374–404, once in March 2014, R. at 346–74, once in June 2014, R. at 406, 411–13, once in July 2014, R. at 407–08, 414–23, and once in June 2015, R. at 409–10, 424–35. During these visits, Plaintiff was consistently diagnosed with depressive disorder, anxiety, alcohol use disorder, and opiate use disorder. See, e.g., R. at 318, 332, 422. He had suicidal thoughts six times[2]—including once when he was "play[ing] around with knives," R. at 413—and on two of those occasions was hospitalized for about a week. R. at 349–70, 375–98. He also regularly reported substance abuse, typically involving alcohol, but also including narcotics such as oxycodone and hydrocodone, see, e.g., R. at 350, 413, 423.

Plaintiff also participated in outpatient mental health counseling at St. Joseph's Hospital from May 30, 2012 to November 14, 2012, R. at 282–97, where he was diagnosed with major depressive disorder, bipolar disorder, PTSD, and generalized anxiety disorder, R. at 288, 295. Later, from August 2014 to September 2015, he received mental health treatment from

---

[1] "A GAF score is a snapshot of an individual's overall ability, and does not indicate systemic or specific ways in which they experience difficulty." R. at 23.

[2] R. at 317, 331, 347–48, 375, 413, 423.

4

Onondaga Case Management Services' ("OCMS") Behavioral Health Clinic, R. at 444–85, and from July 2014 to June 2015 by FamilyCare Medical Group, R. at 487–509, both of which gave him similar diagnoses, see, e.g., 459, 508–09.

### B. Plaintiff's Disability Applications and Accompanying Consultative Exam

Near the end of this period, on July 22, 2015, Plaintiff filed his applications for disability insurance benefits and supplemental security income. R. at 16. In support of his applications, Plaintiff attended a consultative evaluation on October 1, 2015 with a psychologist, Dr. Dennis Noia, Ph.D. R. at 23. Dr. Noia's opinion lies at the center of this appeal.

After describing Plaintiff's medical history, Dr. Noia reported that Plaintiff had mild limitations "regarding his ability to attend to a routine and maintain a schedule," "mild limitations regarding his ability to make appropriate decisions," and "moderate limitations regarding his ability to deal with stress." R. at 514. Dr. Noia attributed these "difficulties" to Plaintiff's psychiatric problems, including "bipolar . . . disorder," and "depressive disorder," and wrote that these problems "may at times significantly interfere with [Plaintiff's] ability to function on a daily basis." Id. Overall, Dr. Noia's assessment of Plaintiff's prognosis was "guarded," but "hope[ful] that with continued intervention and support, he will find symptom relief . . . ." Id.

A few weeks after Plaintiff's examination with Dr. Noia, on October 26, 2015, the Social Security Administration denied his initial applications for disability insurance benefits and supplemental security income. R. at 16. On October 30, 2015, Plaintiff requested a hearing on his applications, which eventually took place on November 6, 2017 in front of ALJ David S. Pang. Id.

### C. Post-Consultative Exam Evidence (October 2015 to November 2017)

Crucially for this appeal, Plaintiff continued to receive treatment for what he claims were worsening symptoms between the date of Dr. Noia's examination in October 2015 and the hearing in front of the ALJ in November 2017, over two years later.

Between October 2015 and November 2017, Plaintiff sought emergency psychiatric treatment on four occasions, including in June 2016, R. at 648–64, July 2016, R. at 664–678, December 2016, R. at 709–31, August 2016, R. at 523–28. Three of these visits resulted from Plaintiff's attempts at self-harm, including cutting his wrists in June 2016, R. at 648, "overdos[ing]" on his father's hydrocodone pills in July 2016,[3] R. at 614, 665–67, and cutting himself and attempting to overdose on pills again in December 2016, R. at 710, 760. Plaintiff's ER visit in August 2016 also stemmed from suicidal ideations. R. at 811. These visits resulted in hospital stays of over a week in July 2016, R. at 679–708, a week in August 2016, R. at 523–28, and a few days in late December 2016. In addition to these attempts at self-harm, Plaintiff was first diagnosed with schizophrenia, schizoaffective disorder, and schizophreniform disorder in this period. R. at 532, 568, 689, 814.

From October 2015 to July 2016, Plaintiff also attended counseling sessions at OCMS with psychiatrist Paula Zebrowski. R. at 564–573. Dr. Zebrowski noted month-to-month changes in Plaintiff's condition and functioning, sometimes for the better, sometimes for the worse. For example, in their March 2016 session, Dr. Zebrowski noted that "the stress between [Plaintiff] and his father has been greatly reduced" and "[Plaintiff] comes in today a different guy." R. at 566. However, in June 2016, Dr. Zebrowski stated that "[Plaintiff's] thoughts are becoming more

---

[3] The hospital treated Plaintiff's overdose as an attempt by Plaintiff to harm himself, R. at 614 (explaining Plaintiff's motivation for overdosing on pills by stating that "[Patient] has been having suicidal thoughts for some time and has planned to shoot himself"), though Plaintiff later denied that he intended to commit suicide, R. at 667.

6

and more disturbing for him," and "it is a clear cognitive decline in his ability to organize his own thinking." R. at 568. Because Plaintiff moved in with his mother shortly thereafter, he ceased treatment with Dr. Zebrowski after their June 2016 meeting.

**D. The ALJ Decision and Subsequent Procedural History**

The ALJ issued his decision on March 12, 2018. R. at 26. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date, January 1, 2011. R. at 18. The ALJ noted that Plaintiff had held a few part-time jobs, including carpentry jobs that were "his forte," but that this intermittent work was not "substantial." Id.

Moving to step two, the ALJ found that Plaintiff had "the following severe impairments: asthma, bipolar disorder, schizoaffective disorder, and polysubstance abuse." R. at 19. The ALJ added that Plaintiff "ha[d] received several diagnoses[,] [and, therefore,] [t]he above diagnoses [were] not meant to exclude any symptoms or consideration of other mental impairments, but to encapsulate those most commonly seen." Id.

At step three, the ALJ concluded that Plaintiff "d[id] not have an impairment or combination of impairments that m[et] or medically equal[ed] the severity of [an] impairment[]" in the Listings. Id. The ALJ determined that Plaintiff had a moderate limitation in "understanding, remembering, or applying information," a moderate limitation in interacting with others, a moderate limitation in "concentrating, persisting, or maintaining pace," and a moderate limitation in "adapting or managing oneself." R. at 19–20. According to the ALJ, this combination of "moderate limitations" were not medically equal to an impairment in the Listings. Id.

Before turning to step four, the ALJ calculated Plaintiff's RFC. R. at 20. After describing Plaintiff's medical history, the ALJ discussed Dr. Noia's consultative opinion, writing that he

7

"afford[ed] this opinion partial weight, as [Plaintiff's] record suggests additional limitations in managing long-range goals and maintaining relationships with others." R. at 23. Based on this medical history and Dr. Noia's opinion, the ALJ then found that Plaintiff "ha[d] the [RFC] to perform a full range of work at all exertional levels but" could only "occasionally tolerate concentrated dusts, fumes, and gases;" could only "perform simple, routine, and repetitive tasks;" and could only "occasionally interact with supervisors, coworkers, and the public." R. at 20–24. The ALJ also noted that Plaintiff had "several limitations as a result of his impairments," but that he was "not as limited as alleged" because his episodes were "overall brief" and he was "generally stable" between. R. at 23–24. Thus, the ALJ concluded that Plaintiff could not "consistently perform more than simple, routine, and repetitive tasks, and [c]ould have no more than occasional interaction with others in the workplace." R. at 24.

At step four, the ALJ found that Plaintiff had "no past relevant work," R. at 24, so he moved quickly on to step five. At step five, the ALJ determined that there were "jobs that exist in significant numbers in the national economy" that Plaintiff could perform. Id. These jobs, according to the ALJ, included "bagger," "laundry laborer," and "garment sorter." R. at 25. Therefore, the ALJ found that Plaintiff was "not disabled" and denied his applications. R. at 25–26.

Plaintiff appealed the ALJ's decision to the Appeals Council, which denied his appeal on December 10, 2018. Dkt. No. 1-3. Plaintiff then filed this action on February 6, 2019. See Compl.

**IV.    DISCUSSION**

Plaintiff argues that there is not substantial evidence to support the ALJ's RFC determination because the ALJ "improperly relied" on Dr. Noia's "stale" opinion when determining Plaintiff's RFC. Pl.'s Brief. At 19–24. First, Plaintiff asserts that Dr. Noia's opinion

8

is stale because it "was rendered more than [two] years before Plaintiff testified at his disability hearing," and "does not provide for the worsening of Plaintiff's mental condition" in the time between its issuance and Plaintiff's hearing. Id. at 19. Second, Plaintiff points out that Dr. Noia's opinion is "the only medical opinion . . . in the record that detail[s] Plaintiff's mental functioning abilities," id. at 21, and, therefore, discounting that opinion as stale would result in an RFC determination based solely, and improperly, on the ALJ's own lay judgment, id. at 23.

In response, Defendant argues that substantial evidence supports the ALJ's RFC finding because Dr. Noia's opinion was not stale. Def.'s Brief at 5–11. According to Defendant, the record "does not show a deterioration of Plaintiff's condition after Dr. Noia's examination," but instead stays "remarkably consistent." Id. at 5–6. Additionally, Defendant asserts that the ALJ cited other evidence to support his RFC finding besides Dr. Noia's opinion, and so even were the Court to determine that Dr. Noia's opinion was stale, there would still be substantial evidence supporting the ALJ's decision. Id. at 11.

**A. Staleness**

The Court finds that Dr. Noia's report was stale by the time of the ALJ's decision because the evidence indicates that Plaintiff's condition deteriorated in the two years between Dr. Noia's examination and Plaintiff's hearing in front of the ALJ.

A medical opinion may become stale "if the claimant's condition deteriorates after the opinion is rendered and before the ALJ issues his decision." Clute ex rel. McGuire v. Comm'r of Soc. Sec., No. 18-CV-30, 2018 WL 6715361, at *5 (W.D.N.Y. Dec. 21, 2018) By itself, "[a] gap of time between when an opinion is rendered and the disability hearing and decision does not automatically invalidate that opinion," Majdandzic v. Comm'r of Soc. Sec., No. 17-CV-1172, 2018 WL 5112273, at *3 (W.D.N.Y. Oct. 19, 2018), but a "meaningful chan[ge]" in the plaintiff's condition during that gap will do so, Lamar v. Comm'r of Soc. Sec., No. 18-CV-829,

9

2020 WL 548376, at *3 (W.D.N.Y. Feb. 4, 2020) (citing Cruz v. Comm'r of Soc. Sec., No. 16-CV-965, 2018 WL 3628253, at *6 (W.D.N.Y. July 31, 2018)). Staleness is a particular issue "where the [allegedly] stale evidence relates to an RFC assessment that was completed before a full medical history was developed." Acevedo v. Astrue, No. 11-CV-8853, 2012 WL 4377323, at *16 (S.D.N.Y. Sept. 4, 2012), report and recommendation adopted sub nom. Acevedo v. Comm'r of Soc. Sec., No. 11-CV-8853, 2012 WL 4376296 (S.D.N.Y. Sept. 24, 2012).

Here, the record indicates in two primary ways that Plaintiff's condition deteriorated between Dr. Noia's examination and the ALJ's decision. First, Plaintiff was not diagnosed with schizophrenia, schizophreniform disorder, or schizoaffective disorder or until after Dr. Noia interviewed Plaintiff and issued his October 1, 2015 report. See, e.g., R. at 568 (June 10, 2016 report from treating psychiatrist Dr. Paula Zebrowski describing Plaintiff as "a 25 year old male who presents for . . . schizophrenia"); R. at 569 (July 2016 discharge report from OCMS describing how Plaintiff had "symptoms of Schizophreniform Disorder"); R. at 591 (records from January 2017 diagnosing Plaintiff with schizoaffective disorder). In his report, Dr. Noia diagnosed Plaintiff as bipolar and noted that Plaintiff's history of hospitalizations were "all for bipolar disorder," R. at 511, 514, but he did not have the benefit of the schizophrenia, schizophreniform, or schizoaffective disorder diagnoses when forming his opinion as to Plaintiff's vocational limitations. These new 2016 and 2017 diagnoses—which the ALJ did have in front of him—suggest that Plaintiff's condition worsened in the period after Dr. Noia examined him.[4] For this reason alone, Dr. Noia's opinion was stale by the time the ALJ relied on it to calculate Plaintiff's RFC. See Pervaiz v. Comm'r of Soc. Sec., No. 18-CV-1283, 2019 WL

---

[4] This is particularly the case because "schizophrenia . . . frequently manifests itself when sufferers are in their late teens or early twenties." See Hunley v. DuPont Auto., 341 F.3d 491, 495 (6th Cir. 2003).

6875232, at *7 (W.D.N.Y. Dec. 17, 2019) (finding stale the opinions of two consultative examiners where plaintiff was diagnosed with "significant mental health disorders" such as OCD and ADHD after the examiners issued their opinions); Reeder v. Colvin, No. 13-CV-1201, 2014 WL 4538060, at *4, 6 (D. Kan. Sept. 11, 2014) (holding that there was not substantial evidence to support an ALJ's RFC assessment where "the ALJ relied on a medical opinion made 41 months prior to the ALJ['s] decision, despite substantial and significant additions to the medical record, including new diagnoses . . . [such as] schizoaffective disorder[] or schizophreniform disorder"). Additionally, the Court finds these new diagnoses especially salient in this case because the ALJ himself found that schizoaffective disorder was one of Plaintiff's severe impairments and opined that this diagnosis was one of the most "commonly seen" in the record. R. at 19. Yet Dr. Noia's opinion—upon which the ALJ relied in making his RFC determination—includes no discussion of or reference to this diagnosis because Plaintiff had not yet received any such diagnosis.

Second, Plaintiff's attempts to harm himself—all of which date from after Dr. Noia's examination—also evidence his worsening condition. As described above, prior to October 2015, Plaintiff was hospitalized several times due to suicidal ideation or plan. See R. at 317, 331, 347–48, 375, 413, 423. However, during this pre-October 2015 period, Plaintiff took no affirmative steps toward acting on his suicidal thoughts. Id. That changed after October 2015. On two occasions, once in June 2016 and once in December 2016, Plaintiff cut himself on his arms, going to the emergency room both times. R. at 648, 710, 760. On another occasion, Plaintiff "overdose[d]" on his father's hydrocodone pills. R. at 614, 665. Acting on his suicidal ideation—which Plaintiff had never done prior to October 2015—is additional evidence that Plaintiff's condition deteriorated after Dr. Noia issued his opinion, rendering the opinion stale. See

11

Andriaccio v. Berryhill, No. 18-CV-84, 2019 WL 1198357, at *6 (W.D.N.Y. Mar. 14, 2019) (ruling that the opinions of two consultative examiners were stale where the examiners drafted them without the benefit of two years of medical records and before "plaintiff's subsequent relapses, failed efforts at rehabilitation[,] or her suicide attempts"); Crawley v. Berryhill, No. 16-CV-271, 2018 WL 2354984, at *3 (W.D.N.Y. May 24, 2018) ("[T]he . . . reviewing physicians rendered their opinion prior to Plaintiff's suicide attempt and inpatient psychiatric treatment and therefore could not have factored this evidence of a deterioration in Plaintiff's mental health into their conclusions. These opinions therefore cannot constitute substantial evidence in support of the ALJ's conclusions.").

Despite this evidence, Defendant asserts that Plaintiff's condition "before and after Dr. Noia's examination [was] remarkably consistent." Def.'s Brief at 6. In support of this argument, Defendant points out that Plaintiff's emergency room visits and hospitalizations "occurred throughout the record," and that the duration of Plaintiff's periods of hospitalization were similar both before and after October 2015. See Def.'s Brief at 9–10 ("[B]efore Dr. Noia's opinion, Plaintiff was hospitalized for suicidal thoughts and plans on two occasions for approximately a week each time, [while] [a]fter Dr. Noia's opinion, Plaintiff was [also] hospitalized on two occasions for approximately two and a half weeks in total."). But this focus on the regularity of Plaintiff's ER visits and length of his hospitalizations elides the different reasons for these trips to the hospital. In the pre-October 2015 examples Plaintiff was hospitalized for suicidal *thoughts*, in the post-October 2015 examples for suicidal *actions*. This suggests that Plaintiff's mental health was deteriorating in the period after Dr. Noia examined him. Moreover, Defendant acknowledges that one of Plaintiff's post-October 2015 hospital admissions was "involuntary," because "his treating psychiatrist reported that he had been declining lately." Id. at 9 (citing R. at

689). By contrast, none of Plaintiff's pre-October 2015 admissions were involuntary. Finally, none of Defendant's arguments address the fact that Plaintiff received several new mental health diagnoses subsequent to Dr. Noia's examination, diagnoses that the ALJ himself found were severe. See R. at 19 ("The Claimant has the following sever impairments: . . . schizoaffective disorder . . . .").

Thus, the Court finds that Dr. Noia's opinion was stale and it was error for the ALJ to rely on it. See Crawley, 2018 WL 2354984, at *3 (error for ALJ to rely on stale medical source opinions); Davis v. Berryhill, No. 16-CV-6815, 2018 WL 1250019, at *3 (W.D.N.Y. Mar. 11, 2018) (determining that the opinions of two consultative examiners were stale because "significant developments in Plaintiff's medical history had occurred since" the opinions were issued, including hospitalizations, hallucinations, and suicidal ideation).

### B. Substantial Evidence

Plaintiff asserts that Dr. Noia's "opinion is the only medical opinion contained within the record that detailed Plaintiff's mental functioning abilities." Pl.'s Brief at 21, 23. Defendant corrects Plaintiff, noting that "a state agency psychologist reviewed the record and provided an opinion regarding . . . Plaintiff's mental impairments," but concedes that the "ALJ did not rely on this opinion." Def.'s Brief at 6. In doing so, Defendant appears to acknowledge that Dr. Noia's opinion was the only medical opinion addressing Plaintiff's mental functioning that the ALJ used in his RFC assessment. See R. at 20–24. Since Dr. Noia's opinion was the only medical evidence addressing Plaintiff's mental abilities, without that opinion to rely on, the ALJ's RFC determination is not supported by substantial evidence.

In this case, "the [only] medical assessment[] relied upon by the ALJ w[as] stale and based on an incomplete medical record, [and] the ALJ could not remedy that deficiency by making the connection between the medical records and Plaintiff's functional limitations

h[im]self." See Davis, 2018 WL 1250019, at *3; see also Wilson, 2015 WL 1003933, at *21 ("Where the medical findings in the record merely diagnose [the] claimant's . . . impairments and do not relate those diagnoses to specific residual functional capabilities," it is not permissible for the Commissioner to "make the connection himself.") (internal citation omitted); Staggers v. Colvin, No. 14-CV-717, 2015 WL 4751123, at *2 (D. Conn. Aug. 11, 2015) ("[A]n ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error."); Reynolds v. Comm'r of Soc. Sec., No. 12-CV-1167, 2019 WL 2020999, at *5 (W.D.N.Y. May 8, 2019) ("[A]n ALJ cannot evaluate raw medical data and extrapolate his own RFC determination.").

The Court recognizes that "where the record reflects only minor impairments, the ALJ may, in his discretion, assess an RFC in the absence of opinion evidence." Andriaccio, 2019 WL 1198357, at *7; see also Wilson v. Colvin, No. 13-CV-6286, 2015 WL 1003933, at *21 (W.D.N.Y. Mar. 6, 2015) (holding that "under certain circumstances, particularly where the medical evidence shows relatively minor physical impairment, an ALJ permissibly can render a common-sense judgment about functional capacity even without a physician's assessment . . . .") (internal quotations and citation omitted). However, "the leeway given to ALJs to make 'common sense judgments' does not typically extend to the determination of mental limitations, which are by their nature 'highly complex and individualized.'" Lilley v. Berryhill, 307 F. Supp. 3d 157, 161 (W.D.N.Y. 2018) (quoting Nasci v. Colvin, No. 15-CV-947, 2017 WL 902135, at *9 (N.D.N.Y. Mar. 7, 2017)); see also Deshotel v. Berryhill, 313 F. Supp. 3d 432, 435 (W.D.N.Y. 2018) (holding that an ALJ's ability to make common sense judgments does not extend to assessment of mental limitations). Thus, this is not a case in which the ALJ could assess Plaintiff's RFC without medical opinion evidence.

Defendant disputes this conclusion, arguing that, even without Dr. Noia's opinion, the ALJ's RFC determination is supported by substantial evidence. Def.'s Brief at 11–13. However, where, as here, Plaintiff's "limitations are significantly mental in character," R. at 24, "the ALJ was not permitted to simply rely on his own lay interpretation of Plaintiff's psychiatric records," see Crawley, 2018 WL 2354984, at *4 (citing Snyder v. Colvin, No. 13-CV-585, 2014 WL 3107962, at *4 (N.D.N.Y. July 8, 2014) (ruling that an ALJ "interpret[ing] raw medical data and interject[ing] her own lay medical judgment" is impermissible)); see also Davis, 2018 WL 1250019, at *3 (deeming consultative opinions stale and then rejecting defendant's argument that, because the ALJ considered the "evidence as a whole," the RFC calculation was supported by substantial evidence").

Under the circumstances, with nothing but a stale medical opinion and his own judgment to rely on, the ALJ's RFC determination is not supported by substantial evidence. See Ortiz, 298 F. Supp. 3d at 586–87 ("[A]n ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence."); Crawley, 2018 WL 2354984, at *3–4 (ALJ's determination that Plaintiff's mental impairments were non-severe was unsupported by substantial evidence where consultative examiner opinions had been rendered stale by "Plaintiff's suicide attempt and subsequent hospitalization" and ALJ "rel[ied] on his own lay interpretation of Plaintiff's psychiatric records").

### C. Remand to Develop the Record

"[I]t is well accepted that an ALJ has an affirmative duty to develop the administrative record." Seals v. Comm'r of Soc. Sec., No. 18-CV-186, 2019 WL 4743653, at *6 (W.D.N.Y. Sept. 30, 2019) (citing Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009)); see also Schuler v. Colvin, No. 13-CV-144, 2014 WL 2196029, at *3 (N.D.N.Y. May 22, 2014) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's

medical history[,] even when the claimant is represented by counsel." (internal quotation marks omitted) (citing Rosa, 168 F.3d at 79)). Here, in light of the evidence that Dr. Noia's opinion was stale, the ALJ had a duty to develop the record and obtain another medical source statement. See Pervaiz, 2019 WL 6875232, at *7 ("At the very least, the ALJ was obligated to obtain a mental health opinion from an examination conducted after [the plaintiff received] significant diagnoses [of OCD and ADHD]."); Tanner v. Colvin, No. 13-CV-746, 2015 WL 6442575, at *5 (W.D.N.Y. Oct. 23, 2015) ("[T]he ALJ may be required to order a consultative examination when . . . the evidence as a whole is insufficient to allow [the ALJ] to make a determination or decision on [the] claim."). This duty was especially critical given Plaintiff's mental health challenges. See Seals, 2019 WL 4743653, at *6 ("Due to the difficulty in determining whether individuals suffering from mental illness will be able to adapt to the demands or stress of the workplace, the duty to develop the record is particularly important where mental illness is present." (citing Marcano v. Berryhill, 17-CV-4442, 2018 WL 5619749, at *11 (S.D.N.Y. July 13, 2018))). The ALJ's failure to do so was error. See Crawley, 2018 WL 2354984, at *3–4 ("It is considered reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision.").

Therefore, the Court remands Plaintiff's case so that the ALJ can obtain a fresh medical source statement assessing Plaintiff's functional capabilities and limitations. See Seals, 2019 WL 4743653, at *7 ("In light of [the plaintiff's recent] medical records, remand is appropriate to obtain an updated psychiatric medical source opinion as to plaintiff's RFC."); Lamb v. Berryhill, No. 16-CV-557, 2018 WL 3342574, at *6 (W.D.N.Y. July 9, 2018) (remanding and ordering the ALJ to obtain a new RFC assessment where record was devoid of non-stale medical opinions); Reynolds, 2019 WL 2020999, at *5 ("[T]o the extent the ALJ relied on Dr. Prezio's two medical

16

opinions at all, those 4-year-old opinions were stale and could therefore not support the RFC determination. Remand is therefore required.") (internal quotation omitted). Of course, "[t]he Court takes no position at this time as to whether any [updated medical source statement] ought to change the ultimate determination of disability[,]" but, at the very least, "consideration" of such an opinion is "require[d]." Courtney v. Comm'r of Soc. Sec., No. 17-CV-897, 2019 WL 2281226, at *3 (W.D.N.Y. May 29, 2019).

V. **CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that the Commissioner's determination of no disability is **VACATED**, and the matter is **REMANDED** for further proceedings consistent with this Memorandum-Decision and Order in which the ALJ should obtain a fresh medical opinion regarding Plaintiff's mental functioning abilities; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED: March 12, 2020
Albany, New York

_____
Lawrence E. Kahn
Senior U.S. District Judge